UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIVIL ACTION NO:
_____

_____ )
SANJAY KULGOD,                     )
                                   )          **JURY TRIAL**
                                   )          **DEMANDED**
              Plaintiff            )
                                   )
       v.                          )
                                   )
                                   )
FEDERAL RESERVE BANK OF            )
NEW YORK                           )
                                   )
              Defendant            )
_____ )

## COMPLAINT AND JURY DEMAND

### PARTIES

1.     The plaintiff, Sanjay Kulgod ("Mr. Kulgod" or "Plaintiff"), is a male resident of the State of New Jersey.

2.     Defendant the Federal Reserve Bank of New York ("Defendant") is a federal instrumentality of the United States Government with its principal office located at 33 Liberty Street, New York, NY.

### JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Kulgod has brought claims pursuant to the Americans with Disabilities Act ("ADA") 42 U.S.C. §§12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621 *et seq.*, the Family and Medical Leave Act, the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. §§1981.

4.      Venue is appropriate in the Southern District of New York as Defendants' acts and omissions giving rise to the claims in this Complaint occurred in the Southern District of New York.  Indeed, Mr. Kulgod worked for the Defendant, and was fired by the Defendant, in Manhattan, NY, which is within the Southern District of New York.  Additionally, the Defendant's principal office is in New York.

5.      This court has jurisdiction over the Defendant because Defendant is a resident of New York because its principal place of business is in New York.  Additionally, Defendant purposefully availed itself of New York law by operating a business in New York, transacting business in New York, and employing employees (including, during the times relevant to this Complaint, Mr. Kulgod) in New York.

## STATEMENT OF FACTS

6.      Mr. Kulgod is a 58-year-old (born in 1965) Indian-American man with light brown skin color who was born in Jaipur, India (northern India).  Accordingly, Mr. Kulgod is Indian (from India) in terms of his national origin.

7.      Mr. Kulgod considers himself Northern Indian in terms of his race.

8.      In or around September 2013, Mr. Kulgod was hired by Defendant as a technology consultant in Manhattan, New York, New York.

9.      At all relevant times, Defendant employed at least 20 or more employees for 20 or more weeks during the preceding 12 calendar months.

10.      As such, Defendant is an employer under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination and Employment Act ("ADEA").

11.     Additionally, the Defendant employed at least 50 or more employees for 20 or more weeks during the preceding 12 calendar months. As such, the Defendant is an employer under the Family Medical Leave Act (FMLA).

12.     At all relevant times, Mr. Kulgod was a qualified employee and his performance was satisfactory.

13.     In or around September 2014, Mr. Kulgod became a technology architect for the Defendant.

14.     Mr. Kulgod was promoted based on his merit to senior technology architect on or around September 29, 2015.

15.     In or around 2015, Mr. Kulgod began to experience chronic insomnia (sleep disorder), a condition which causes him extreme difficulty falling or staying asleep and results in fatigue.

16.     Chronic insomnia is an impairment which substantially limits one or more of Mr. Kulgod's major life activities including, but not limited to, his ability to sleep, perform some activities due to fatigue, and to connect to the people around him. Additionally, chronic insomnia is a condition which substantially limits one or more of Mr. Kulgod's major bodily functions, including his circadian, neurological, and brain functions. As such, Mr. Kulgod is disabled under the ADA.

17.     Mr. Kulgod continued to work through 2015 and 2016 with satisfactory performance, despite periodic flare-ups of his disability.

18.     In or around the beginning of 2017, Mr. Kulgod was diagnosed with post-traumatic stress disorder ("PTSD") after experiencing symptoms of extreme anxiety, depression, and a worsening of his insomnia disability.

19.     Mr. Kulgod's PTSD is an impairment which substantially limits one or more of his major life activities including, but not limited to, his ability to eat, sleep, control his emotions, and enjoy life. Additionally, Mr. Kulgod's PTSD is an impairment which substantially limits one or more of his major bodily functions, including his neurological and brain functions. As such, Mr. Kulgod is disabled under the ADA.

20.     In or around March 2017, Mr. Kulgod contacted Robert Goodman ("Goodman"), the Vice President of Technology for the Defendant and his direct supervisor, and disclosed his PTSD and insomnia disabilities.

21.     Mr. Kulgod disclosed to Goodman that he was experiencing a flare up of his PTSD symptoms of anxiety and social withdrawal, and Mr. Kulgod explained those symptoms exacerbated his inability to sleep due to his insomnia disability.

22.     Goodman is a white (Caucasian) man born in the United States who is, upon information and belief, a non-disabled individual.

23.     After Mr. Kulgod disclosed his disabilities to Goodman, he (Goodman) began to treat Mr. Kulgod in a worse manner than the non-disabled employees as well as employees who were lighter skinned, non- Indian, and/or native-born employees.

24.     For example, Mr. Kulgod noticed that Goldman would routinely give American-born Caucasian senior technology architects more desirable assignments with greater room for advancement. By contrast, Mr. Kulgod was assigned tasks that presented less opportunity for career advancement.

25.     In or around the summer of 2017, Mr. Kulgod raised protected concerns to Goodman that he (Mr. Kulgod) was being discriminated against compared to non-disabled, Caucasian, and American-born employees by receiving worse job assignments.

26.     For example, Issac Goldstein ("Goldstein"), Leon T. ("Leon"), and Adrian Hodor ("Hodor"), all received better job assignments, and eventually received promotions due to these better assignments.

27.     Upon information and belief, Goldstein, Leon, and Hodor are all non-disabled, white skinned, Caucasian individuals in their 40s.

28.     Notably, Mr. Kulgod's performance was as strong as (and in fact exceeded) the performance of these non-disabled, white-skinned, younger individuals.

29.     In response, Goodman told Mr. Kulgod that he "doesn't connect" to other people and that was why Mr. Kulgod was receiving worse job assignments (which didn't lead to promotions), in clear reference to the PTSD symptoms (including social anxiety) Mr. Kulgod had earlier disclosed to Goodman.

30.     Mr. Kulgod raised protected concerns by telling Goodman that he (Mr. Kulgod) was concerned by his discriminatory comments based on his disability symptoms.

31.     Further, "connecting with people" was not a function of Mr. Kulgod's job and not a legitimate basis to give him worse job assignments that didn't lead to promotions.

32.     After this, Mr. Kulgod transferred internally to the Defendant's market division, a position which he excelled at.

33.     Mr. Kulgod continued to work throughout 2017, 2018, 2019, and 2020, despite worsening PTSD symptoms, which sometimes progressed to physical symptoms such as heart palpitations.

34.     Indeed, Mr. Kulgod was given a large pay raise in 2019 based on his outstanding job performance.

35.     In or around the middle of June 2021, Pratap Retnaswamy ("Retnaswamy"), became Mr. Kulgod's direct manager at the Defendant.

36.     Retnaswamy is an Indian-American man who originally comes from the southern Tamil Nadu region of India who is at least 15 years younger than Mr. Kulgod and is, upon information and belief, non-disabled.

37.     Although Mr. Kulgod and Retnaswamy are both originally from India, Retnaswamy discriminated against Mr. Kulgod for being from the northern city of Jaipur (as there are heavy cultural distinctions between their regions in India, including different native languages, religious practices, and politics).

38.     Indeed, Jaipur and the Tamil Nadu region have typically been distinct culturally, politically, and ethnically from each other and had been completely independent from each other until the British invaded.

39.     Additionally, Mr. Kulgod and Retnaswamy had different colored skin, as is typical between their two distinct national regions.

40.     In or around the summer of 2021, Mr. Kulgod was discussing the difficulty he was having seeing his mother due to COVID travel restrictions and mentioned that he would normally visit her in Jaipur.

41.     In response, Retnaswamy nonsensically told Mr. Kulgod, "that is why I don't like the north," discriminatorily referring to northern India.

42.     Retnaswamy specifically told Mr. Kulgod that he (Retnaswamy) did not like Mr. Kulgod because of the fact that Mr. Kulgod was from northern India (and thus part of a different ethnic/ancestral background from him).

43.     Notably, this was also related to skin color, as Retnaswamy and Mr. Kulgod had different colored skin (Retnswamy had darker skin than Mr. Kulgod).

44.     Mr. Kulgod responded by attempting to work professionally with Retnaswamy and continuing to perform his job satisfactorily.

45.     Additionally, Retnaswamy disproportionately promoted younger, non-disabled individuals from the Tamil Nadu region in the south of India/individuals with different skin color than Mr. Kulgod.

46.     For example, Rajeshwaran N. ("Rajeshwaran"), a non-disabled man from south India (with different skin color than Mr. Kulgod) in his early 30s, was recruited as an officer for the Defendant.

47.     To recruit the young and inexperienced Rajeshwaran as a high-level officer was highly unusual in the Defendant.

48.     Notably, Mr. Kulgod had expressed interest in this position but was not interviewed or considered for it.

49.     Retnaswamy also began making discriminatory comments implicating Mr. Kulgod's age.

50.     For example, Retnaswamy asked Mr. Kulgod what year he graduated from college and told Mr. Kulgod that he would investigate into whether or not his education was "current."

51.     This was despite the fact that Mr. Kulgod had worked for the Defendant for 8 years, had years of prior experience, and had kept abreast of industry developments while keeping his credentials up to date.

52.     Additionally, it came to Mr. Kulgod's attention that Retnaswamy was training younger, non-disabled employees such as Rajeshwaran on new technologies but was declining to train Mr. Kulgod in the same technology.

53.     Mr. Kulgod raised protected concerns by asking Retnaswamy why he was training the younger, non-disabled, and south Indian Rajeshwaran on the new technologies but was declining to train him (Mr. Kulgod) in the same technologies, despite Mr. Kulgod's extensive industry experience and relevant technological certifications.

54.     Retnaswamy responded by dismissively saying he, "didn't think [Mr. Kulgod] would like to learn new technology" as a clear reference to Mr. Kulgod's age.  Indeed, Retnaswamy was clearly showing his biased belief that, because Mr. Kulgod was older, he was somehow set in his ways and unwilling to learn.

55.     Mr. Kulgod explained that he did want to learn the technology and have the training, but Retnaswamy continued to refuse to provide it to him.

56.     In or around January of 2022, Mr. Kulgod was diagnosed with atrial fibrillations, a heart condition that causes chest pains, palpitations, and light headedness. This condition was exacerbated by Mr. Kulgod's PTSD and insomnia disabilities.

57.     Atrial fibrillation is a condition which significantly impairs one or more of Mr. Kulgod's major life activities including his ability to perform strenuous activity, walk, and stand for long periods of time. Atrial fibrillation is also a condition which significantly impairs one or more of Mr. Kulgod's major bodily functions including his cardiovascular and heart functions. As such, Mr. Kulgod is further disabled under the ADA.

58.     On or around March 7, 2022, Mr. Kulgod's doctor recommended that he work from home for about two months in order to minimize the stress associated with commuting so

that Mr. Kulgod could better manage his disabilities' symptoms and reduce potential triggers for disability symptom flare-ups.

59.     Notably, this request was not an undue burden on the Defendant, as, upon information and belief, numerous similarly situated employees worked from home.

60.     Mr. Kulgod contacted Amy Chiaravallo ("Chiaravallo"), a human resources representative at the Defendant, and requested the reasonable disability-related accommodation of working from home for around 6 to 8 weeks.

61.     Chiaravallo purportedly granted Mr. Kulgod this request.

62.     Chiaravallo is an American born white (Caucasian) woman who is at least 15 years younger than Mr. Kulgod. Upon information and belief, she is non-disabled.

63.     Mr. Kulgod was able to successfully and satisfactorily perform his job duties during the period of time he worked remotely from home as a disability accommodation.

64.     Indeed, during this period Mr. Kulgod did not receive any meaningful performance concerns or counseling related to his work product.

65.     In or around mid to late May 2022, Mr. Kulgod returned to the office.

66.     In or around April 2022, Retnaswamy escalated his harassing conduct even while (and seemingly because) Mr. Kulgod was working from home.

67.     For example, Retnaswamy would frequently sarcastically inquire about Mr. Kulgod's medical conditions and would say that he didn't believe Mr. Kulgod could handle the 'stress' of the job because of Mr. Kulgod's PTSD.

68.     Retnaswamy would also unfoundedly blame Mr. Kulgod for others' mistakes.

69.    For example, Srinivas Raghavan ("Raghavan"), a lead technology architect with the Defendant, failed to deliver an assignment to Retnaswamy in or around December, 2021 and Retnaswamy repeatedly and baselessly blamed Mr. Kulgod for Raghavan's error.

70.    Raghavan is a non-disabled man from the south of India who is at least 10 years younger than Mr. Kulgod with different skin color than Mr. Kulgod.

71.    In or around the end of April 2022, Mr. Kulgod contacted Cira Rom ("Rom"), a human resources officer for the Defendant, and raised concerns about Retnaswamy's harassing behavior.

72.    Specifically, Mr. Kulgod detailed how Retneswamy would refuse to train and collaborate with him and would often belittle Mr. Kulgod in meetings because he was from northern India, because of Mr. Kulgod's age, because of Mr. Kulgod's skin color, and because of Mr. Kulgod's disabilities.

73.    Upon information and belief, the Defendant took no action related to Mr. Kulgod's protected concerns.

74.    In or around August 2022, Mr. Kulgod began to experience inflammation and soreness in his right wrist, eventually culminating in him being unable to use his right hand to eat or drink, let alone type.

75.    In or around the beginning of August 2022, Mr. Kulgod's doctor diagnosed him with acute tendonitis in his right wrist.

76.    Acute tendonitis is a condition that, during flare-ups, substantially limits one or more of Mr. Kulgod's major life activities including lifting, eating, drinking, typing, throwing, and carrying items. Acute tendonitis is also a condition that substantially limits one or more of

Mr. Kulgod's major bodily functions including but not limited his musculoskeletal functions. As such, Mr. Kulgod is further disabled under the ADA.

77.     On or around August 15, 2022, Mr. Kulgod's doctor recommended that he take a medical leave due to the severe conditions associated with his tendonitis and other disability symptoms.

78.     Mr. Kulgod contacted Lisa Walsh ("Walsh"), an HR representative for the Defendant, and requested the reasonable disability-related accommodation of a medical leave protected by the FMLA until around December 12, 2022.

79.     At this time and at all relevant times, the Defendant employed at least 50 or more employees within 75 miles of where Mr. Kulgod worked. As such, the Defendant was an employer under the FMLA.

80.     Additionally, at this time and at all relevant times Mr. Kulgod had been employed by the Defendant for over one year and had worked at least 1250 hours.

81.     Tendonitis is a serious health condition causing periods of incapacity and requiring continuous care by a healthcare professional and as such served as a legitimate basis for leave protected by the FMLA.

82.     Walsh purportedly approved Mr. Kulgod's request for protected disability-related leave.

83.     Upon information and belief, Walsh is a white (Caucasian) woman who is at least 10 years younger than Mr. Kulgod and non-disabled.

84.     Mr. Kulgod returned as scheduled on or around December 12, 2022.

85.     When Mr. Kulgod returned to work, he noticed that he had received a negative performance review from Retnaswamy (which was created and issued while he was on leave), citing deadlines that Mr. Kulgod had supposedly missed while out on approved medical leave.

86.     Mr. Kulgod raised protected concerns by asking Retnaswamy about this review and reminding him that he (Mr. Kulgod) was out on an approved (and protected) disability-related medical leave.

87.     Retnaswamy did not respond to Mr. Kulgod's protected concerns.

88.     Due to the refusal of the Defendant to retract this review that cited things that had not been completed while Mr. Kulgod was out on a protected leave of absence, it is evident the Defendant was retroactively revoking and/or denying Mr. Kulgod's accommodation request of protected leave.

89.     On or around January 25, 2023, barely more than one month after he returned from disability-related FMLA leave, Mr. Kulgod was terminated by Retnaswamy, allegedly for poor performance.

90.     Notably, Mr. Kulgod was terminated in close temporal proximity to having utilized disability-related medical leave protected under the FMLA.

91.     Upon information and belief, Mr. Kulgod was replaced by a non-northern Indian and non-disabled individual who is more than ten years younger than Mr. Kulgod and had different skin color.

92.     Notably, Mr. Kulgod was terminated without receiving any warnings about his performance, aside from a single discriminatory performance review issued while Mr. Kulgod was on protected leave.

93.     Upon information and belief, the Defendant utilizes a progressive disciplinary policy wherein employees are given first a verbal warning (documented in writing), then a formal warning, before being suspended and/or terminated for poor performance.

94.     Indeed, the Defendant fully utilizes its progressive discipline policy when disciplining younger, non- Northern Indian, non-disabled, and/or native-born employees.

95.     Additionally, Defendant virtually always issues one or more performance improvement plans before terminating any employee for performance.

96.     Notably, Mr. Kulgod was never issued a performance improvement plan and thus was not given an opportunity to improve pursuant to a performance improvement plan.

97.     Therefore, the Defendant violated its own policy and standard practices by failing to provide Mr. Kulgod with one or more steps of progressive discipline and failing to provide him with a performance improvement plan.

98.     On or around June 2, 2023, Mr. Kulgod timely filed a Charge of Discrimination with the New York City Commission on Human Rights ("NYCCHR") and cross-filed this charge with the United States Equal Employment Opportunity Commission ("EEOC").

99.     Mr. Kulgod voluntarily removed his case from the NYCCHR and was issued an an administrative closure for administrative convenience on or around November 17, 2023.

100.    On February 7, 2024, the EEOC issued Mr. Kulgod a Right to Sue letter.

101.    This lawsuit is timely filed.

## COUNT I

### (Race, Color, and National Origin Discrimination in Violation of Title VII)

### Mr. Kulgod v. Defendant

102.    Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

103.     During all relevant periods, Defendant was an employer under Title VII, 42 U.S.C. §§ 2000e, et seq. (hereinafter, "Title VII") because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

104.     Mr. Kulgod is an Indian-American man with brown skin color who was born in Jaipur, India (northern India).

105.     Defendant, by and through its agents harassed and discriminated against Mr. Kulgod with respect to his compensation, terms, conditions, and/or privileges of employment, because of Mr. Kulgod's race, national origin, and/or color.

106.     More specifically, Defendant subjected Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-Northern Indian and/or different colored colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

107.     Upon information and belief, Defendant replaced Mr. Kulgod with a lesser or similarly qualified, non-northern Indian individual with different skin color.

108.     Defendant, including its agents and employees, committed a discriminatory act in a willful, wanton, and/or malicious manner.

109.     As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

110.     Plaintiff seeks all damages to which he is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT II

**(Race and Color Discrimination in Violation of 42 U.S.C. § 1981, et seq.)**

**Plaintiff v. Defendant**

111.     The Plaintiff herein incorporates all paragraphs above and below as if set forth fully herein.

112.     During all relevant periods, Defendant was an employer under the meaning of 42 U.S.C. § 1981, et seq. (hereinafter, "Section 1981") because it employed one or more persons.

113.     Mr. Kulgod is an Indian-American man with light brown skin color who was born in Jaipur, India (northern India).

114.     Defendant, by and through their agents harassed and discriminated against Mr. Kulgod with respect to his compensation, terms, conditions, and/or privileges of employment, because of Ms. Kulgod's race, national origin, and/or color.

115.     More specifically, Defendant subjected Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-Northern Indian and/or different skin colored colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable

assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

116.    Upon information and belief, Defendant replaced Mr. Kulgod with a lesser or similarly qualified, non-northern Indian individual with different skin color.

117.    The Defendant's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of the Plaintiff and/or conduct so reckless to amount to such disregard.

118.    As a direct and proximate result of Defendant's violations of Section 1981, The Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

119.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

**COUNT III**

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Mr. Kulgod v. Defendant**

120.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

121.    During all relevant times, the Defendant was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

122.    Mr. Kulgod suffered from disabilities (including chronic insomnia, PTSD, atrial fibrillation, and acute tendonitis) which are (and at all relevant times were) physical impairments which (each individually and collectively) substantially limits one or more of his major life activities, including his ability to sleep, perform some activities due to fatigue, connect to the people around him, eat, enjoy life, perform strenuous activity, walk, stand for long periods of time, lift, throw, and carry items. Furthermore, Mr. Kulgod's disabilities are (and at all relevant times were) physical impairments which (both individually and collectively) substantially limits the operation of one or more of his major bodily functions, including, but not limited to, his circadian functions, neurological functions, cardiovascular functions, and musculoskeletal functions. Accordingly at all relevant times Mr. Kulgod was disabled under the ADA.

123.    At all relevant times, Mr. Kulgod was a qualified employee and was capable of performing the essential functions of his job with or without one or more reasonable accommodations.

124.    Mr. Kulgod disclosed his disabilities to the Defendant; and/or the Defendant were aware of Mr. Kulgod's disabilities; and/or the Defendant regarded Mr. Kulgod as disabled.

125.    Mr. Kulgod requested and/or utilized disability-related reasonable accommodations that would have assisted him in performing the essential functions of his job. For example, Mr. Kulgod requested medical leaves, the ability to work from home, and the ability to avoid heavy lifting.

126.    The disability-related accommodations requested by Mr. Kulgod did not pose an undue burden on the Defendant.

127.    The Defendant failed to engage in an interactive dialogue related to one or more of these disability-related accommodation requests.

128.    The Defendant unlawfully denied one or more of Mr. Kulgod's disability-related accommodation requests, including, but not limited to, his request for leave (by pushing him for things he allegedly should have done while on leave).

129.    The Defendant, by and through their agents harassed and discriminated against Mr. Kulgod with respect to his compensation, terms, conditions, and/or privileges of employment, because of Mr. Kulgod's disability and/or because he is an older individual with a disability.

130.    More specifically, Defendant subjected Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-disabled colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

131.    Upon information and belief, the Defendant replaced Mr. Kulgod with a lesser or similarly qualified, non-disabled younger employee.

132.    The Defendant acted with malice and/or with reckless indifference to the federally protected rights of Mr. Kulgod.

133.    As a direct and proximate result of the Defendant's violation of the ADA, Mr. Kulgod has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

134.    Mr. Kulgod seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorneys' fees, and costs.

**COUNT IV**

**(Age Discrimination in Violation of the Age Discrimination in Employment Act)**
**Mr. Kulgod v. Defendant**

135.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

136.    During all relevant times, the Defendant was an employer under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. (hereinafter, "ADEA") because the Defendant employed 20 or more individuals for 20 or more calendar weeks during the relevant calendar years.

137.    The Defendant, by and through its agents harassed and discriminated against Mr. Kulgod with respect to his compensation, terms, conditions, and/or privileges of employment, because of Mr. Kulgod's age and/or because Mr. Kulgod was an older individual with a disability ("age plus" discrimination).

138.    More specifically, Defendant subjected Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-Northern Indian and/or brown skinned colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

139.    Upon information and belief, the Defendant replaced Mr. Kulgod with a lesser or similarly qualified, younger employee.

140.    The Defendant acted willfully in violating the ADEA, and with willful and/or knowing indifference to the federally protected rights of Mr. Kulgod.

141.    As a direct and proximate result of the Defendant's violations of the ADEA, Mr. Kulgod has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

142.    Mr. Kulgod seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

**COUNT V**

**(Interference with, and Retaliation for, Exercising Rights under the Family and Medical Leave Act – 29 U.S.C. §2615)**

**Mr. Kulgod v. Defendant**

143.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

144.    During all relevant times, the Defendant was engaged in an industry affecting commerce and employed 50 or more employees for 20 or more calendar work weeks in each current and/or preceding calendar year.

145.    As such, at all relevant times, the Defendant was an employer under the FMLA.

146.    At all relevant times, the Defendant employed 50 or more employees within 75 miles of Mr. Kulgod's worksite.

147.    At all relevant times (from September 2013 onward), Mr. Kulgod had worked for the Defendant for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

148.    As such, from September 2013 onward, Mr. Kulgod was an eligible employee under the FMLA.

149.    Mr. Kulgod suffered from one or more serious health conditions, including, but not limited to, chronic insomnia, PTSD, atrial fibrillation, and acute tendonitis.

150.    Mr. Kulgod was entitled to FMLA leave.

151.    Mr. Kulgod sought to exercise his rights under the FMLA, including by requesting and utilizing one or more protected leaves under the FMLA.

152.    Specifically, Mr. Kulgod sought to utilize a continuous leave.

153.    Mr. Kulgod timely notified Defendant that he would need FMLA leave.  Mr. Kulgod later utilized leave that should have been considered covered under the FMLA.  Mr. Kulgod also opposed, and engaged in other protected activity, related to the improper refusal of Defendant to allow him to utilize FMLA-protected leave (through disciplining him for not working during the leave).

154.    Defendant interfered with, restrained, and/or denied the exercise of, or the attempted exercise of, Mr. Kulgod's rights under the FMLA, including by giving him a negative performance review related to things not completed while he was on leave, which amounted to having required him to do work while on leave (and imposing adverse actions because Mr. Kulgod did not perform work during his leave).

155.    Defendants, including by and through their agents, retaliated and/or discriminated against Mr. Kulgod for requesting and/or utilizing FMLA leave by subjecting Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his colleagues who had not taken FMLA leave, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

156.    Defendant's actions, including its violations of the FMLA, were willful and undertaken in bad faith.

157.    As a direct and proximate result of the Defendant's violation of the FMLA, Mr. Kulgod has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

158.     Mr. Kulgod seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

## COUNT VI

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*)

### Mr. Kulgod v. Defendant

159.     The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

160.     Mr. Kulgod engaged in protected activity under Title VII, including, but not limited to, by expressing protected concerns that he was being subjected to discrimination and harassment based on race, color, and/or national origin.

161.     The Defendant unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Kulgod's exercising of or enjoyment of one or more rights granted by Title VII.

162.     More specifically, Defendant subjected Mr. Kulgod to adverse actions as retaliation for actions he engaged in that were protected under Title VII, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-Northern Indian and/or brown skinned colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

163.     The Defendant acted with malice and/or with reckless indifference to the federally protected rights of Mr. Kulgod.

164.     As a direct and proximate result of the Defendant's violations of Title VII, Mr. Kulgod has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

165.     Mr. Kulgod seeks all damages to which he is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorneys' fees, and costs

## COUNT VII

### (Retaliation in Violation of 42 U.S.C. § 1981, et seq.)

### Mr. Kulgod v. Defendant

166.     The Plaintiff herein incorporates all paragraphs above and below as if set forth fully herein.

167.     During all relevant periods, the Defendant was an employer under the meaning of 42 U.S.C. § 1981, et seq. (hereinafter, "Section 1981") because they employed one or more persons.

168.     Defendant harassed and discriminated against the Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of the Plaintiff's race and color.

169.    The Plaintiff engaged in protected activity under Section 1981, including, but not limited to, by voicing protected concerns regarding, and otherwise opposing, the harassing and discriminatory actions improperly undertaken by the Defendant, and the Defendant's employees and agents, based on the Plaintiff's race and color and the creation of a hostile work environment through illegal harassment and discrimination related to race and color.

170.    Defendant retaliated against the Plaintiff for engaging in protected activity, by subjecting Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his non-Northern Indian and/or brown skinned colleagues, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

171.    Defendant acted with malice and/or with reckless indifference to the federally protected rights of the Plaintiff.

172.    As a direct and proximate result of Defendant's violations of Section 1981, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

173.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain,

suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

## COUNT VIII

### (Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)

### Mr. Kulgod v. Defendant

174.    Mr. Kulgod incorporates all paragraphs above and below as if set forth fully herein.

175.    The Plaintiff engaged in protected activity under the ADA, including, but not limited to, requesting and utilizing reasonable accommodations for disabilities which were intended to allow Mr. Kulgod to perform the essential functions of his job and raising concerns about being improperly disciplined for not doing work while utilizing an accommodation.

176.    The disability-related accommodation requests which Defendant retaliated against Mr. Kulgod for requesting and/or utilizing included, but were not limited to, medical leaves, lifting restrictions, and the ability to work from home.

177.    Defendant unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Kulgod's exercising of or enjoyment of rights granted by the ADA.

178.    More specifically, Defendant subjected Mr. Kulgod to adverse actions as retaliation for engaging in activities protected under the ADA, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his colleagues who had not engaged in protected activity, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

179.     The Defendant acted with malice and/or with reckless indifference to the federally
protected rights of Mr. Kulgod.

180.     As a direct and proximate result of the Defendant's violation of the ADA, Mr.
Kulgod has suffered and continues to suffer damages, including, but not limited to, lost
compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life,
and emotional damages.

181.     Mr. Kulgod seeks all damages to which he is entitled, including, but not limited to
lost compensation and benefits (including, but not limited to, back pay and front pay), other
monetary damages, compensatory damages (including, but not limited to, future pecuniary
losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and
other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages,
interest, attorneys' fees, and costs.

## COUNT IX

### (Retaliation in Violation of the Age Discrimination in Employment Act)

### Mr. Kulgod v. Defendant

182.     The Plaintiff incorporates all paragraphs above and below as if set forth fully
herein.

183.     Mr. Kulgod engaged in protected activity under the ADEA, including, but not
limited to: (i) opposing, expressing protected concerns, and/or engaging in other protected
activity regarding a hostile work environment based on age and/or (ii) opposing, expressing
protected concerns, and/or engaging in other protected activity related to the harassing and

discriminatory actions taken by the Defendants due to Mr. Kulgod's age and/or because he was an older person with a disability.

184.    Defendant retaliated against Mr. Kulgod for opposing, voicing protected concerns, and/or engaging in other protected activity related to one or more practices made unlawful by the ADEA by subjecting Mr. Kulgod to adverse actions, including, but not limited to, subjecting Mr. Kulgod to a harassing and otherwise hostile work environment, treating Mr. Kulgod less favorably than his colleagues who had not engaged in protected activity, refusing to provide Mr. Kulgod training, giving Mr. Kulgod less desirable assignments and opportunities for career development, denying Mr. Kulgod promotions, giving Mr. Kulgod an unfair and discriminatory review, and/or terminating Mr. Kulgod's employment.

185.    Defendant acted with malice and/or with reckless indifference to the federally protected rights of the Plaintiff.

186.    As a direct and proximate result of Defendant's violations of the ADEA, Mr. Kulgod has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

187.    Mr. Kulgod seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), compensatory damages, diminished earning capacity, injury to reputation, other monetary damages, liquidated damages, attorneys' fees, interest, and costs.

WHEREFORE, the plaintiff, Sanjay Kulgod, respectfully prays that this honorable court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendant liable on all counts;

C.  Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay);

D.  Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation;

E.  Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff his reasonable attorney's fees;

J.  Reinstatement of Plaintiff into his position with the same level of seniority as he had prior to his termination;

K.  Award the Plaintiff interest and costs;

L.  Award the Plaintiff all other damages to which he is entitled; and

M.  Grant such further relief as is just and equitable.

Respectfully Submitted,

SANJAY KULGOD

By his attorneys,

THE LAW OFFICES OF WYATT
& ASSOCIATES P.L.L.C

Date:   April 19, 2024                    By:    */s/Timothy J. Brock*

Benjamin J. Wyatt (#5604590)
BWyatt@Wyattlegalservices.com

Timothy Brock (#5614151)
Tbrock@wyattlegalservices.com

Main Office:
The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1111
Facsimile: (603) 685-2868

New York Office:
The Law Offices of Wyatt & Associates,
P.L.L.C.
69 State Street, 13th Floor, Suite 1320
Albany, NY 12207